**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. ELH-19-0286** |
| **DANIEL BLUE,** | |
| **Defendant** | |

**RESPONSE IN OPPOSITION TO**
**DEFENDANT'S APPEAL OF DETENTION ORDER**

On March 23, 2020, the defendant filed a motion for review of the Honorable Beth P. Gesner's order of detention. *See* ECF 193. The only novel claim in this motion is that COVID-19 is a changed circumstance meriting the defendant's release. While the defendant acknowledges that there is a presumption that applies in favor of detention, the defendant challenges Judge Gesner's factual findings that he poses a danger to the community – "That Mr. Blue has a proven track record on pretrial release in this case/related case. Mr. Blue is not a threat of flight and or a potential danger to the community." *See* ECF 404 at 2. This contention is factually inaccurate, as the defendant previously violated federal supervise release. The defendant is a high-level drug trafficker with access to firearms and has a history of poor performance under court supervision. Under the Bail Reform Act, armed recidivist drug dealers who violate the terms and conditions of their probation simply are not candidates for release.

This Court and the United States District Court for the District of Columbia recently have denied similar claims for detainees (such as this defendant) housed in facilities run by the D.C. Department of Corrections ("DOC"). *See United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Order by Judge Grimm); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76

1

(Order by Magistrate Judge Sullivan); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake); *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day); *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order dated March 19, 2020. Because the defendant's generic argument runs counter to the individualized determination required by the Bail Reform Act, and because the defendant has failed to make a sufficient factual showing for the relief sought, this Court should do the same and deny the motion, without a hearing.

## BACKGROUND

Daniel Blue is a lead-defendant in a 25-defendant conspiracy case arising out of an investigation into a drug trafficking organization operating in the Monument Street corridor of East Baltimore, Maryland. In August 2018, after compiling several undercover buys and additional intelligence, investigators conducted a ten-month federal wiretap investigation. During the wiretap investigation, investigators intercepted and identified the defendant as a source of supply for at least two drug trafficking organizations operating in East Baltimore. From at least October 2018 through December 2018, DEA investigators intercepted phone calls during which the defendant and his co-conspirators discussed drug trafficking activity. Physical and electronic surveillance revealed that the defendant supplied cocaine and other narcotics to the DTO's street-level distributors, as well as other Baltimore drug traffickers. In addition to the wiretap and physical surveillance, investigators conducted undercover buys and several search and seizure warrants were executed on the targets and their stash locations which resulted in the seizure of multiple guns, drugs (cocaine, heroin and fentanyl) and money. As to the defendant, on January 8, 2019, the DEA executed a search warrant at the defendant's residence resulting in the recovery of two firearms and approximately $45,000.

On June 11, 2019, the defendant along with 19 co-defendants were initially charged by Indictment with 17 counts that included one count of Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, several counts of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c) as well as several counts of Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1). ECF 23.

On June 25, 2019, an additional six defendants were indicted in a Superseding Indictment with 30 counts that included the above charges as well as a one count of Money Laundering in violation of 18 U.S.C § 1956. ECF 96.

Specifically, the defendant was charged with Conspiring to Distribute more than one kilogram of heroin, more than five kilograms of cocaine, more than 280 grams of crack, and a detectable amount of fentanyl in violation of 21 U.S.C. § 846, which carries a sentence ranging from 10 years' to life imprisonment, and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c), which carries an additional 5 years consecutive to any sentence imposed.  On July 8, 2019, Judge Gesner held a detention hearing, at the conclusion of which she found by clear and convincing evidence that the defendant posed a risk to the safety of other persons and the community and that there was no condition or combination of conditions that would reasonably assure community safety.  ECF 193.  Judge Gesner highlighted several factors that supported her position for detention.  Specifically, she noted the nature of the offense that included "the possession of guns and narcotics" as well as the defendant's "role in the offense." *Id.*  Judge Gesner also noted this defendant's criminal history which included "multiple narcotics convictions" – as well as a "federal narcotic conviction" and a "VOSR".  *Id.*  Judge Gesner further indicated that the defendant had "poor adjustment to community supervision" and included in her decision the recommendation of pretrial services.  *Id.*

On March 23, 2020, the defendant filed the pending appeal. ECF 404. The defendant's only new argument in favor of release is speculation regarding COVID-19. As detailed below, the motion should be denied without a hearing.

## ARGUMENT

A defendant may appeal a Magistrate Judge's detention order to the District Court. 18 U.S.C. § 3145(b). In considering such an appeal, the District Court reviews the Magistrate Judge's detention order *de novo*. *United States v. Stewart*, 19 Fed. App'x 46, 47 (4th Cir. 2001). Thus, the District Court must make "an independent determination of the proper pretrial detention or conditions of release." *Id.*[1]

### I. The Appeal Ignores Nearly All of the Section 3142(g) Factors, Which Weigh Heavily in Favor of Detention

The defendant's appeal, in which he indicates that he is "concerned of the potential impacts of the current health crisis and the impact it could have at the jail," is speculative at best. *See* ECF 404 at 2. Additionally, the defendant does not address any health risks that would affect him at this time. The factors a court must consider in determining whether a defendant poses a danger to the community and upon which Judge Gesner relied in ordering detention, include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the nature of the charges against the defendant, the Government also is

---

[1] The district court need not conduct a new pretrial detention hearing; rather, the court may base its decision on the original detention hearing and any additional evidence proffered by counsel. *See United States v. Williams*, 753 F.2d 329, 331 & n.7 (4th Cir. 1985).

entitled to a presumption that no combination of release conditions will assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A).

In this case, an examination of the § 3142 factors, which the defendant glosses over as inapplicable to him, clearly demonstrate that the detention order should remain in place.

### A. The Nature and Circumstances of the Offenses

As a source of supply, the defendant was responsible for helping pump kilograms of poison into the streets of Baltimore for the duration of the investigation. The defendant provided cocaine to street-level drug trafficking "shops." During the course of the investigation, investigators identified two drug shops located in the 400 block of North Montford Avenue at Jefferson Street (the Montford DTO) and in the 2400 block of East Monument Street at Port Street (the "Out the Mud", or OTM DTO). During the wiretap investigation, investigators intercepted and identified the defendant as one of the cocaine sources of supply for the Montford DTO and OTM DTO as well as other Baltimore area drug traffickers. He also kept firearms at his house. As the Court is well aware, neighborhood DTOs like the one the defendant helped supply drugs are responsible for hundreds of deaths in Baltimore each year, either as a result of violent acts committed by DTO members or overdose deaths suffered by the DTO's customers.

### B. Weight of the Evidence

The evidence against the defendant is overwhelming. It established that he was a source of supply from at least October through December 2018, which is the time-frame that he was intercepted. The DEA conducted surveillance on multiple occasions in which they observed the defendant meeting with co-conspirators and engaging in drug trafficking activities. The following wiretap interceptions are examples of the numerous interceptions between the defendant and indicted co-conspirators:

- On September 21, 2018, Charlton Morris called Blue and said, "I'm at the trap yo?" Blue replied, "Yeah I ain't understand. What you want me… Come right down Montford and

5

Monument real fast cause I ain't understand. I'm ready to drive right there." Morris met up with Blue at the intersection of Monument St and N. Montford Ave.

- On November 2, 2018, investigators observed Blue meet with Tony Solomon to receive a supply of cocaine. On November 4, 2018, Blue met with Solomon to pay the remaining debt owed for the cocaine supplied to Blue. Based on intercepted electronic (SMS) communications between Blue and Solomon, investigators believe Solomon advised Blue that he would sell him two kilograms of cocaine for seventy-two thousand and five hundred dollars ("72.5. Square feet…").

- On November 7, 2019, based on intercepted calls between Blue and Egan Davis, investigators conducted surveillance. During the calls, Blue told Davis, "Shit, make sure…make sure your what's her name is right. You know, 37th Street. cause he gon'…you feel what I'm saying?" Davis replied, "You ain't got to tell me. My shit, my shit already in them single joints, ya heard me? My shit already, already got the lock and key on that mother fucker." Investigators believe the reference to "37th street" is a reference to $37,000. Investigators believe Blue purchased a kilogram of cocaine from Solomon and then sold the kilogram of cocaine to Davis. After Davis met with Blue, Blue called Davis to ask about the cocaine quality and Davis told Blue, "Oh yeah, I looked at it, I just, yeah yeah yeah. She lookin pretty. I just had to run somewhere, you heard me?" After investigators observed Davis throw away trash, investigators recovered a kilogram wrapper from the dumpster located at Davis' residence – 4300 Bedrock Circle, Baltimore Maryland.

- Between November 26, 2018 and November 28, 2018, investigators intercepted calls between Blue and Christopher Redd. During the calls, Redd texted Blue to meet at the Erdman Shopping Center. Investigators believe Blue was going to sell cocaine to Redd. Redd texted Blue after the deal and indicated that he did not like the product, "That's a no go." Additionally, investigators believe Redd advised Blue that his customers did not like the quality of the product BLUE sold him, "They aint like that."

- On December 1, 2018, an uncharged drug trafficker sent Blue a text message indicating that kilograms of cocaine were available to be purchased at $34,000.00 per kilogram, "Kim34@gmail.com."

In addition to the wiretap surveillance, investigators conducted hundreds of hours of physical surveillance over the course of this investigation as well as executed search and seizure warrants. As discussed above, investigators executed a search and seizure warrant at the defendant's residence. Investigators recovered 3 cell phones, a Taurus .45 caliber LC/410 gauge handgun with 3 410 gauge shells under the basement stairs in a bag, 2 watches, Louis Vuitton and Rolex, Kahr .45 caliber handgun with 5 rounds in the family room couch pillow, knotted plastic bag with .5 ounce powder substance confirmed non-controlled dangerous substance (initially

believed to be cocaine) in the kitchen cabinet, and $45,817.  Additionally, during the search warrant, investigators called the phone that was intercepted during the course of the investigation and one of the three phones rang.

### C.  History and Characteristics of the Person

The defendant does not have a lengthy criminal record, but he does have prior narcotic convictions, to include one prior federal narcotic conviction.  He was convicted in 2005, at age 23, for Distribution of Crack Cocaine, and Judge Blake sentenced him in 2007 to 60 months incarceration and 48 months supervised release (Criminal Case No.: CCB-05-0572).  He violated that supervised release in 2013 and was sentenced to an additional 6 months.  As such, contrary to counsel's claim that the defendant has a "proven track record on pretrial release" is clearly inaccurate.  His criminal convictions began in 2004 with a conviction for Possession of Controlled Dangerous Substances.  In 2011, he was convicted in federal court for Conspiracy to Distribute Controlled Substances and Possession with Intent to Distribute Controlled Substances, however, this conviction was appealed and later vacated (Criminal Case No.: ELH-11-0508).

As a result of his criminal conduct, the defendant has accrued 5 criminal points, placing him at a Criminal History III, the criminal history category in the U.S. Sentencing Guidelines.  If he were convicted of a controlled substance offense, the defendant would be looking at significant time up to 150 months incarceration.

While the defendant may have a minimal criminal record, the fact that he has a prior federal conviction for a similar offense, clearly shows that he has not discontinued his drug trafficking activity.

### D.  The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

The defendant is a recidivist. He has not stopped, nor will he stop, dealing drugs and possessing guns.  He will not comply with a court-ordered supervision.  He failed to comply with

his previous term of federal supervised release.  Someone who committed these crimes once would pose a significant risk to the community, but the defendant's inability to be dissuaded from drug trafficking and in this instance to be charged with additional firearm offenses creates an undeniably high risk that he will endanger the community if he is released pending trial.

The evidence of the defendant selling drugs and procuring drugs using his cellphone also poses a unique danger to the community as it would be easy for him to continue this business while on pretrial release.  If he were placed on location monitoring, there is little to stop him from continuing his drug business.  That is particularly the case where, as here, much of the conduct involved coordinating drug trafficking via cellular telephone.  A substantial risk therefore exists that in the event of the defendant's release he would continue to operate his DTO either personally or through intermediaries.  It is undeniable that drug dealing is a "dangerous transactional business" and that a drug dealer may possess firearms to defend his drugs, his drug proceeds, or his person. *United States v. Moore*, 769 F.3d 264, 270 (4th Cir. 2014).  Cocaine is a highly addictive and dangerous drug that destroys lives, destroys families, and kills.  Maryland's Department of Health reported that, in Maryland, there were 792 cocaine-related deaths in 2018.[2]  Given this inherent danger, the defendant, a drug dealer with a firearm, should not be released pending trial.

For all of these reasons no condition or set of conditions of release would reasonably assure the safety of the community.

---

[2] https://bha.health.maryland.gov/Documents/Annual_2018_Drug_Intox_Report.pdf

**II.     Officials Have Established Comprehensive Health Measures at CDF to Avoid a COVID-19 Outbreak**

The defendant himself does not contest this analysis, focusing instead on the health risks posed by the COVID-19 outbreak. To be sure, the Bail Reform Act instructs courts to consider the "physical and mental health" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release. Currently, there are no cases of COVID-19 at CDF. While the defendant does not acknowledge he has COVID-19, he also does not allege that he has been exposed to any individuals with COVID-19. In this way, he is not seeking release based on his *actual* "physical and mental health." Instead he relies solely on the *possibility* of becoming infected. As discussed below, however, CDF has implemented substantial precautionary measures to mitigate this risk.[3]

**A. Comprehensive Precautionary Measures Have Been Instituted at CDF to Avoid a COVID-19 Outbreak**

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of precautionary measures to limit the risk of COVID-19 transmission into and inside CDF.[4] DPSCS is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the Centers for Disease Control and Prevention (CDC) and Maryland Department of Health (MDH) regarding the disease.

---

[3] The following individuals provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; and (4) DPSCS Lieutenant Nina Riser.

[4] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza. When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, including CDF, did not suffer any outbreaks.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulting in a state of emergency. Accordingly, DPSCS has employed the following measures at CDF[5]:

- *Social Visitation.* DPSCS has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering CDF and interacting with detainees.[6] Defense attorneys are still permitted to visit their clients in person; however, attorneys and detainees are separated by a glass wall and communicate with each other through the use of a telephone.

- *Detainees Entering the Facility.* Unlike many of DPSCS's facilities, which are needed to house the constant influx of new state arrestees, CDF houses federal detainees and, at this time, few federal detainees are entering CDF. The only new detainees entering CDF are a limited number of new arrestees who present a particular safety risk to the community and individuals already are in transit to the facility.

- *Screening Procedures.* In the few instances in which a new detainee enters CDF, he will be housed in an intake facility for approximately one week, where he will be screened by

---

[5] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

[6] Due to the hardship this poses, DPSCS has given each detainee five free telephone calls per day to ensure that each detainee is able to remain in contact with friends and family members.

medical professionals for coronavirus symptoms and exposure risk factors before being placed in the general population.

- *Detainee Movement.* The Court's Second Amended Standing Order postponed all criminal trials scheduled to commence through April 24, 2020, and postponed all criminal proceedings through March 27, 2020. Case No. 1:00-mc-0302, ECF No. 93 (filed Mar. 14, 2020). This means that detainees will not need to leave CDF during this period for any court appearances, except for emergencies. In the event that a detainee has a court appearance, he will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken twice via a forehead thermal reader to ensure he does not have a fever. To further avoid the possibility of exposure, the USMS has issued a prohibition on prisoner transfers to the courthouse or elsewhere for proffers, including a prohibition on agent transport writs and Chief Judge Bredar memorandum requests that would permit agents to pick up prisoners from a facility.

- *Sanitation and Hygiene.* Each detainee is in possession of his own supply of soap to wash his hands at any time throughout the day. Moreover, CDF recently completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish. Signs and hand sanitizer have been posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently. The Secretary of DPSCS also has ordered that all facilities, including CDF, increase surface cleaning. In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched.

- *Quarantine.* DPSCS is following the CDC guidelines regarding testing for COVID-19 and isolation of individuals with symptoms and/or risk exposure factors. If a detainee exhibits flu-like symptoms or presents risk exposure factors, designated cells in a remote part of CDF have been set aside to serve as a quarantine area, where medical professionals can monitor those detainees. Across the street from CDF is a DPSCS facility with "negative pressure rooms," where the ventilation is designed to avoid re-circulating air into the general population to limit the possibility of cross-contamination from room to room.

- *Correctional Officers.* Although correctional officers will need to enter and re-enter the facility, they have received multiple mandatory trainings over the past week about how to mitigate the risk of exposing detainees to the disease. Correctional officers have been ordered to stay home if they have any symptoms of the disease, and advanced paid leave will be provided for any employees who have not accrued sufficient paid leave, to disincentive sick employees from coming to work to avoid loss of pay.

Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar. The USMS has appointed

Steven D. Akers, the former Assistant USMS Chief, to serve as a liaison with the Court, and to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

**III.     Releasing Defendant and Others Similarly Situated Would Place An Undue Burden on the Pretrial Services Office and the Courts, Thereby Increasing Community Danger.**

The defendant asks the court to consider releasing him to a third party custodian, his mom, and be subject to "24/7 home detention." ECF 404 at 2. Awarding relief here, and in similar cases, would place a substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, as well as the Court. Whenever the Court orders electronic monitoring, a Location Monitoring Specialist is appointed to oversee the defendant's pretrial release. To be sure, one case, by itself, would not strain the system. But if the Court released the defendant, then undoubtedly an avalanche of defendants would also seek release. Each defendant would make the generic argument, now being made by the defendant, due to his concerns regarding the "potential impacts of the current health crisis and the impact it could have at the jail." ECF 404 at 2. The Court has detained the defendant to protect the community *from* him. The speculative prospect of a COVID-19 outbreak at CDF does not diminish the public interest in keeping the defendant off the streets based on a judicial finding of dangerousness that cannot be ameliorated by any combination of release conditions. And if the Court did release the defendant, and other defendants, such release would not only endanger the community, it would quickly stretch the bandwidth of existing LM specialists beyond its breaking point.[7]

---

[7] Before a Defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion and order his continued detention pending trial.

          Respectfully submitted,

          Robert K. Hur
          United States Attorney

By:   /s/ LaRai Everett
       LaRai Everett
       James T. Wallner
       Assistant United States Attorney